Good morning, your honors. My name is Nate Kellum and I represent the appellant Matthew Meinecke and if I could reserve three minutes for rebuttal. Mr. Meinecke comes to this court seeking timely relief from a Seattle policy that removes speakers like Mr. Meinecke away from traditional public forum and away from their intended audience when the speech is met with hostility. It's a curbing speech when it is threatened by a violent stoppage. As such, the policy is unconstitutional and ought to be enjoined. It violates Mr. Meinecke's right to free speech as well as his right to due process. The policy invariably targets content and is constitutionally invalid. As this court found in Center for Bioethical Reform versus Los Angeles County Sheriff's Department, a heckler's veto exists when when there is a restriction, a speech restriction due to a negative reaction from the listener. And that's precisely what we have here. In Seattle, per policy, the way their policy works is they have an obstruction ordinance 12A16010A3 of the Seattle Municipal Code and they will invoke it when a speaker is speaking to an audience and is not received well and they perceive a risk of injury and if that happens then they will tell the speaker you need to leave, you need to remove yourself from the audience so that they cannot be exposed to your message or you will be obstructed. So the policy you're talking about is really more a practice of how they enforce this obstruction statute? That's right, Judge Brass. And so it's not really the ordinance itself as much as how they enforce this ordinance along with what they call a time, place, and manner. So what kind of injunction are you asking for? It would enjoin their application of the ordinance and their time, place, and restriction so not to remove speakers from traditional public forum when it's met with hostility. Why wouldn't it be specific to your client? Well, I think that that would be certainly appropriate but it would seem like it would apply to Mr. Meineke, it would apply to others as well. I have somewhat the same question. If we credit that this really is a heckler's veto situation, I had a little trouble understanding the scope of the injunction asked for. So how would the city distinguish between situations which were heckler's veto situations and true time, place, and manner restrictions? Because it would be premised on their reaction of the listener, then that would be a heckler's veto situation. And so that would be what would be enjoined and that's the policy and practice that they have in place. So anytime that there is pushback or animosity or potential violence as a result of the content of the speaker, that would be a heckler's veto situation? That would be a heckler's veto situation. What would, what specifically would you enjoin so that the officer on the street would understand here's what I'm supposed to do? Enjoying removing a speaker, restricting a speaker due to how well the message is received. I take it at some point you would agree that the situation gets so volatile, so dangerous that the interest in saving a life or preventing somebody from having serious harm would outweigh the First Amendment? I think you would agree with that? It would seem that following a content-based analysis of strict scrutiny would be appropriate because it's a content-based restriction where you would use the least restrictive means for restricting what is a compelling interest of saving life or saving harm, certainly. The problem here is it wasn't the first resort. It was the first resort. I know we didn't get there. Would it have been, for constitutional, to have erected some kind of barrier between Meineke and the crowd that was, which would evoke this animosity towards this topic? No question. I think it would have been. I think that would have been a constitutional way to address that issue and a far more appropriate way to address the issue. Either do that through the barriers, perhaps have a police presence, address the hecklers, the ones who are actually violating the law. I think there were a lot of alternatives that the city had at its disposal that it just did not deploy because they have a policy in place where if the speech is met with hostility, they first focus in on the speaker and try to remove the speaker. You say they have a policy, but I see the allegations being specific to your client. Are there other allegations about other people or other practices that you brought forward? Because we have the incidents, the two cases out there. I'm not aware of other incidents, Judge Bress, but what we have in place is something that was confirmed by the Director of Police Accountability. That's how they handle it, that when there is a speaker and then it is met with hostility, then what they do is they invoke this obstruction ordinance. And so I'm only aware of these two occasions, but they certainly applied it consistently in those two occasions with Mr. Meineke. If you're correct in your argument about the heckler's veto and if the case were then remanded to the district court to reconsider, would you again ask for an injunction that covered everything or would you narrow it to Mr. Meineke? Mr. Meineke's concern is really Mr. Meineke. I would think it would apply to other speakers, but that is certainly the concern that's being pursued in this action. And so for that, we believe that because it is a heckler's veto, it violates free speech. Also, I believe there are due process concerns as well because you have an obstruction ordinance that is utilized in a way that it ordinarily is not. That is, it is affecting someone who is speaking. They're speaking in a place where they have every right to speak and not engaged in violence because violence has occurred from listeners that is being used against him. So I would say in addition to a free speech violation, there's also a due process violation. And with that, Your Honors, I would submit that Mr. Meineke is entitled to a preliminary injunction that he should prevail on those two constitutional claims. That because it does represent irreparable harm to him, like the stated in Elrod v. Burns, a 1976 U.S. decision with constitutional violations at stake. And then also there's really no appreciable harm to the city to refrain from applying the obstruction ordinance in a complex manner of restrictions in this particular way. And that they can deal with safety and order concerns in a far more legitimate manner. That there's for them and it's in the public's best interest to be able to have citizens be able to speak freely, even if their speech is not liked, even if their speech is not popular, to be able to do so and not allow an unruly mob or someone who dislikes what they have to say to be able to control whether they can say it or not. And so with these prongs being met, we believe that a preliminary injunction along those lines for Mr. Meineke would be appropriate here. And so we would ask that that this court reverse the decision below and instruct the the court below to enter an injunction along that lines. But that's that's really my argument, but I'd be glad to answer any questions of the court. Well maybe you want to save the rest of your time for rebuttal? I will. Thank you. Good morning. Good morning, Your Honor. Dallas Sapir on behalf of the City of Seattle. The case before us simply is not a case of a heckler's veto. A heckler's veto is a situation in which, as a result of a reaction from a crowd to a message, the government bans speech and the use of separation, protest zones, counter-protest zones, and buffer zones to ensure that the citizens of a city can continue to exercise their First Amendment rights in safety for themselves and for the listeners has been the standard practice and accepted by the Supreme Court for at least 30 years. Were there buffer zones here? That was exactly what the city was creating. By doing what? By arresting him and taking him out? No, by asking Mr. Meineke on June 24, 2022, to please cross the street. That would create a separation between the main crowd and Mr. Meineke, while still allowing Mr. Meineke, who was amplified on June 24, to reach his audience without the continued risk of violence. And on June 26, when Mr. Meineke was asked to relocate... In some of the cases you have, some of the ones involving abortion clinics and so on, you have a buffer zone that is that is all known in advance, so everybody knows sort of what the rules are, where you can go and where you where you can't go. Was there anything, any advance warning to any speaker, including Mr. Meineke, that Seattle was creating a buffer zone or a free speech zone? Yes, Your Honor. Now, in the case of planned events, obviously the city can respond in advance of the day in question. Looking back at 2020, that was something that happens repeatedly, where you had these two separate groups, the Blue Lives Matter, Black Lives Matter, Antifa, and Proud Boys, and all of those groups, they were creating buffer zones and counter-protest zones in advance. However, both the Dobbs decision, I'm sorry, both in the Dobbs protest and in the PrideFest case, there was no advance notice that Mr. Meineke was going to come up and be speaking, and that there was a risk of... Whether you know that you've got a counter-speaker or not, you can create a buffer zone. So I think my question to you was, in advance of these so that it would have been known to Mr. Meineke and other people who came? When they asked him to move, yes, that was their notice. Let me repeat the question for the third time, okay? In advance of this event, did Seattle Police create a buffer zone so that people in advance, like Mr. Meineke, would have known where the free speech zone was? I apologize, Your Honor, I was misunderstanding the there's going to be these events, this speech, or that there was a risk of violence beforehand. The city did not have an opportunity to create that in advance. Once... This is a spontaneous buffer zone. Correct, Your Honor. Once it was a spontaneous act, break down the civil order, the officers responded... And they moved him off of one side, one sidewalk, and invited him to go to a different sidewalk? They, on the 24th, asked him to cross the street, yes, sir. In... And your view is that a spontaneous buffer zone, by asking somebody to move from a place where they have a right to be otherwise under the First Amendment, is not a heckler's veto? Correct, Your Honor, because Mr. Meineke, Mr. Meineke, the appellate in this case, was still provided the public forum in which he wished to speak and access to his audience. Right, but it's not quite a buffer zone, right? Because you took one person who had one speech, one viewpoint, and moved him away, but the other people were allowed to stay. They weren't put in their own buffer zone, or at least they were put in a preferable one. And, Your Honor, logistically speaking, yes, we had to ask the one person to move rather than attempting to move the thousands of people on the other side. And looking at the idea that one may be more preferable or not, again, looking back to the buffer zone created around President Bush back in 2001, where they said that the one may be more desirable than the other, as long as the desirable position is not given based on content, but is simply given for logistical reasons, that is acceptable. Well, he said, I guess there's some dispute, because he said, well, they ordered him to go over there where he didn't think that the, I guess, the viewers would be able to either hear or to see his signs. So it wasn't, in his view, it wasn't a comparable, it wasn't a buffer zone, it was an exclusion zone. And while Mr. Meineke has argued that he was excluded, the evidence in front of the district court and the evidence on the record here simply does not support that. A look at the videos that were in evidence show that Mr. Meineke on June 24th was amplified, that Mr. Meineke was on the sidewalk, and in the video, specifically the police video at ER 81 at Exhibit S, memory service room, you can see the people walking on the other side of the street into and out of the parking lot. And he can't be heard on the video. So clearly, Mr. Meineke could be heard and could be seen. And on June 26th at the Pride Fest, you can see, as Mr. Meineke is walked out of the event, that as he comes up to the edge of the parking lot of the sidewalk, the event is much larger than just the area he was in, that he still has access to people, and he can be seen and heard by the attendees on that event as well, even if he had complied with the requirements. Would the, would the protesters who were surrounding Mr. Meineke have simply followed him across the street if he had moved from one corner to another corner? The only evidence in this case is that, no, they would not. Mr. Meineke — What is the evidence that they would not? Of course. And Mr. Meineke has alleged in his verified complaint that when he was assaulted, the protesters picked him up, took him across the street, and dropped him off. So that's the indication that as long as he had that separation, they would not have. That's the only evidence we have about whether or not they would have followed him. So in other words, because he has a contrary point of view, he gets to be picked up and dropped on the other side of the street by the — Absolutely. And the City says, well, there it is. He's now in a buffer zone. Absolutely not, Your Honor. Is that the City's position? No, absolutely not. The City's position is the first thing that officers have to do when they arrive is restore order and safety to everybody, and then they can begin investigating the crime that had occurred. They unfortunately, in these cases, did not get past the restoring order before Mr. Meineke was arrested. However, the fact that, you know, there are some alternatives that they could have done, like providing a permanent police protection, erect boundaries around him, does not make it not a narrowly tailored restriction — I'm sorry, to have been put in place, because as the Court has held, that fact that there might be a better alternative is not the question of whether the restriction is reasonable. The officers can be heard on the tape repeating over and over again time, place, and manner. Correct. Time, place, and manner. They've been well coached. What about this should make us think that this was a time, place, and manner restriction? Absolutely, Your Honor. And the reason is Mr. Meineke is being given a place restriction, being asked to move some distance from the hospital grounds. But that just sounds like spontaneously this is for the convenience of the police. I mean, this is at a time of their choosing and a place where they want and a manner they want. But that doesn't feel like a time, place, and manner restriction in the way that the First Amendment conceives of those things. Yes, Your Honor. It is ideal and it is the city's, you know, practice to put in place restrictions beforehand when they can foresee the possibility of violence in any planned event. But a time, place, and manner restriction would generally apply to all parties. It might be a noise — it might be a noise restriction or a concert has to end by 10 o'clock restriction. But that would apply to — that would be a rule of general applicability, a neutral rule. What was neutral about this? Again, the separation itself is applying to both parties. What makes this time, place, and manner? I just — this just doesn't sound anything like any time, place, or manner restriction that I've ever seen. And again, looking at the — I know it's a case of minimal precedent in this case, but the plaintiff has cited to the Bible believers case. Which case? The Bible believers case. Okay. Right. And that is the most factually on-point case that is readily available. And in that, citing to the Supreme Court, the Court had a situation in which speakers had arrived at, in that case, an Islamic heritage event, and they were making a set of protests to them that were highly denigrating and resulted in violence. And the police ordered them to leave the event and go home. The Sixth Circuit found that to be a heckless veto. The distinction here, and it is a distinction that was made within the Bible believers case, is that the city may have used any other means to restore public order and prevent the ongoing violence, short of silencing Mr. Meineke — or, I'm sorry, in that case, the plaintiff. They specifically noted putting him into a protest zone, courting him off, separating them. While this was not a large-scale breakdown, such as what happened to Menotti or in the 2020 protest, that could be planned for and approached in advance, it was a spontaneous breakdown of public order. The use of a separation is a standard form of time, place, and manner restriction that has been upheld repeatedly, both in this circuit and in the Supreme Court. If you characterize it as a heckler's veto case, then what's the standard of review as to the so-called time, place, and manner that you now want to invoke? Isn't it strict scrutiny? No, it is the lesser standard that was invoked on time, place, and manner restrictions, that it has to be both in support of the fundamental government interest, narrowly tailored, and providing alternative means of incontribution. You know, we use that mantra of time, place, and manner in different kinds of cases, and it seems to me the premise of my question is that this is a heckler's veto case. He's opposing the position of the individuals in the plaza, or depending on whether it's the pride or the abortion situation. So if you have a heckler's veto, and then you impose what you characterize as time, place, and manner, the question is, shouldn't we be reviewing that under strict scrutiny, not a lesser standard? If it is found to be a heckler's veto, meaning both elements of a heckler's veto, which is that there is a restriction based on the reaction of the crowd that silences the speaker, then yes, it would be strict scrutiny. And so there is definitely a reaction of the crowd, right? Correct, Your Honor. And in terms of removing him, isn't that meet the heckler's veto criteria? No, Your Honor, because Mr. Meineke was not silenced. He still had access to the public forum, and he still had access to his audience. And that is the distinction for when a reasonable time, place, and manner restriction transforms into a heckler's veto, is when the speaker is silenced as a result of the reaction, rather than some method made to restore order to allow everybody to continue to exercise their First Amendment rights safely. I don't know that the test is complete silence. I mean, I think some amount of restriction on your First Amendment rights is going to be a cognizable claim. So I don't know that it really moves the needle to say he was on the other side of the street, he had a bullhorn, he could do well enough. That's not usually an argument we accept in this context. And also, this is a little bit different than the Bible believers, which you refer to, because there it was removed completely. So this is somewhere in between. In between, yes, Your Honor. And I think the distinction has to come down to whether or not, and obviously complete silencing is not the test, but whether he's effectively lost access to the public forum or to his audience. And that is what he has not lost in this case. And the evidence on the record shows that Mr. Meineke both still had access to the public forum, the sidewalks, still had access to the public forum, the streets, and still had access to his audience both at the Dobbs protest on the 24th and to the Pride Fest, which he would still have been in on the 26th. So you mentioned a couple of times that he was amplified. Was he amplified in both instances? He was amplified on the 24th. If memory serves me from the video on the 26th, Mr. Meineke was not amplified on that day. Okay. So it was amplified at the Dobbs hearing. At the Dobbs. Yes. But not the Pride. No. Was there anybody else in that event that was amplified? I believe on the video at the Dobbs event, there is what sounds to be somebody who was amplified. At the Pride Fest event, not that I'm aware of. Okay. All right. But let's just focus on the one word. So the only person who was amplified and was removed was Mr. Meineke, as far as we know. So a time, place, and manner restriction would say, well, amplification disrupts businesses to cause windows to break near a hospital, whatever the reasons would be. But, again, that rule would be applied neutrally to anybody who was using in an area in which the city had said no amplification at these times and during these hours. But if only Meineke is removed, that's a heckler's veto. That's not a time, place, or manner restriction, because nobody else who was amplified was removed. Yes, Your Honor. The concern is that Mr. Meineke is not the only one being subject to this. He's a separation being created in which would be enforced, presumably on both sides. So, again, if they come approaching Mr. Meineke once he's separated — They move him back to the other street, to the same street where he was? They would maintain the separation and have forced the protesters who were approaching Meineke to separate back onto the side of the street from which they started. And the same thing once they had moved him on the Pride Fest. So the idea that it's just simply just moving him, what they're doing is creating a buffer zone. Was he blocking the sidewalk? No. He was just standing next to the crowd. So once they create that separation, it applies to both of them. It's just a logistical concern of who do they move, one person or several thousand, to create that buffer zone. The buffer zone itself is what would be enforced. Why were all of the thousands on his side of the street at the moment that he was there? I'm sorry, Your Honor. Why were all of — you said that there were several thousand people. Why were the several thousand people all on his side of the street? Well, they were there first, Your Honor. There was a Dobbs protest in front of the Federal Building on June 24th that Mr. Meineke came to and started preaching at. So that's why they were all in one spot. They were gathering there. And the same thing for the Pride Fest. That was a planned event, and I see I'm out of time. If you'd like me to finish my answer, I'm willing to ask you. That was a planned event that Mr. Meineke attended. So they were all there because that was where that event was occurring, and Mr. Meineke showed up afterwards. Okay. Hearing no more questions, I want to thank you for your argument this morning, and we'll hear rebuttal. Thank you, Your Honor. Just briefly, as far as clarifying the extent of the effect on Mr. Meineke on both June 24th and 26th, what the record shows is that on June 24th, that's where it took place in downtown Seattle, and you had the abortion rally. The people were staging at the corner and the intersection of 2nd Avenue and Marion Street, and where Mr. Meineke was forced to go or where he was told to go was on the other side of Madison Street, which was one block over. And so essentially what you had is you had a distance that was created between himself and the individuals. He couldn't have conversations, obviously. He couldn't hand out literature. I'm sorry? He was told to go over to Madison, not Marion. Yes. Yes, Your Honor. And so doing that, that created significant separation between him and his would-be audience. Their backs were to him, so his signs really were not much use. Now, it is possible that maybe someone toward the back could have heard what he said, but that would have been severely restricted as well. And then, of course, the whole move was even tenuous because had somebody just followed him over there and was antagonistic again, he would have been required to move again per the policy. On June 26, in a pride fest at the Seattle Center, he was, as the record shows, he was required to leave the entire park, even though he's already outside the contours of the event. Pages 91 and 92, that's shown in the closed case summary of the Director of Police Accountability, he was required to leave the entire Seattle Center, so he couldn't reach anyone that was actually in the park. And so this makes it actually, I believe, very similar to Bible Believers where they were removed from the festival. Likewise, Mr. Monarchy was removed from the festival. And just as the Sixth Circuit held in Bible Believers, I believe it would be appropriate for this Court to hold this a heckler's veto here. Let's just ask just hypothetically, if he's on one side of the street and there's a group of people who are upset with him, is it permissible for the police to move him just to the other side of the street, or do you think they need to do other things before that? I believe they should do other things, particularly if he wants to do hand-out literature like he did in this case. I believe other things ought to be pursued. Certainly it could come a situation where the only thing they can do, the last resort, is to move somebody. And if that's the case, that would seem appropriate. But here, police presence, put up some type of barrier, do something else besides restricting the speech would have been the better course. The other side analogizes this to a buffer zone. Do you agree with that characterization? Do you dispute that? I don't. I believe that's not what this is. A buffer zone would apply universally. It would not just apply to one person's and one person's point of view. Do you agree that at some point in these kind of situations, the police could put together what they're calling a buffer zone? You could move one person who maybe has a minority viewpoint to another area that's more secure? I think, yeah, in advance you could put together something. I would think in that type of situation, hypothetically, they still would need to have an opportunity to reach their audience in some way. If you can't reach the audience, I believe the buffer zone itself also could be problematic. But as long as an individual can reach their audience from where they're required to be, it would seem to be constitutional. It's one thing where you've got a permit in advance. You know there's going to be a big protest. Police can make arrangements for buffer zones and that sort of thing. But what, in your view, could the police do in a dynamic situation like this? They could do it in this type of situation where it just arrives. Because we don't have all the advance. Yes, we know that DOPS came down. Yes, we know there could be protests, but it's not an organized protest per se. Right. And I don't think it could have been predicted that someone would come and share a gospel Christian message and it would be so poorly received. I don't think that could be predicted. So it would seem like if the situation, once you see that, certainly I think a police presence made a world of difference. If you just have a police officer standing there, that does not happen. Or you could say, okay, let's try to put together some type of perhaps a little barrier here to while Mr. Monaco could be allowed to speak and be able to reach his audience, I would think those types of solutions would have been far superior to what they have in place, and that is focus in on the speaker and try to remove him. What's the situation at which the police can move him across the street, would you say? I think we agreed risk of death, yes. Risk of serious injury, probably. Where do you think that line is? Because I think what the other side would say is it's difficult for police officers who are in the middle of this to try to gauge some of those things and these situations can develop quickly. If it's a situation where the police, I'm trying to think of it hypothetically, where the police are unable by their presence to discourage individuals from continuing to attack Mr. Monaco, perhaps they're attacking the police. I would think they could start with arresting the individuals who are doing the attacking, but there seems to be overwhelming numbers. Yes, I would think you would do different things, which could include that, but it would seem to be a pretty extraordinary situation. Yes, that really goes to the standard of review also. Yes, it does. It goes to, yes, is it the least restrictive means to further a compelling government interest? I have nothing further if there's any other questions. Well, I think hearing no further, thank you very much for your argument. We thank Mr. LaPierre for his argument. This matter is submitted. We'll stand in recess until tomorrow. All rise.
judges: McKEOWN, BYBEE, BRESS